Filed 4/29/26  K.H. v. Superior Court CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| K.H. et al.,<br><br>    Petitioners,<br><br>        v.<br><br>THE SUPERIOR COURT OF CONTRA COSTA COUNTY,<br><br>    Respondent;<br><br>CONTRA COSTA COUNTY CHILDREN AND FAMILY SERVICES BUREAU,<br><br>    Real Party in Interest. | A175348<br><br>(Contra Costa County Super. Ct. No. J2400403) |

In this dependency proceeding involving L.H., a boy born in 2022, the juvenile court terminated reunification services to L.H.'s parents—K.H. (Mother) and B.C. (Father)—and set a Welfare and Institutions Code[1] section 366.26 selection and implementation hearing.  Mother and Father, through counsel, have filed petitions seeking extraordinary writ relief and

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

requesting a stay of the section 366.26 hearing.[2]  We will deny the petitions and the stay requests.[3]

## I. BACKGROUND

### A. *Detention, Jurisdiction, and Disposition*

On July 17, 2024, the Contra Costa County Children and Family Services Bureau (Bureau) filed a section 300 dependency petition on behalf of 19-month-old L.H.  In the petition and an accompanying detention report, the Bureau alleged that, on July 14, 2024, L.H. and his two-year-old sibling were playing outside on the hot sidewalk for two hours, naked except for very soiled diapers, while Mother slept inside the house.  A similar incident reportedly had occurred on July 2, 2024.

In the July 14 incident, police officers, responding to a call from a neighbor, found the children outside and also noticed numerous items strewn about the front yard and porch, including a kitchen knife with a six-inch blade on the outside porch.  The officers arrested Mother and detained L.H. and his siblings.  Mother told police the children had not been fed or changed since the night before, although she later stated they had been fed and changed that morning.

The petition also alleged Mother had not scheduled necessary medical appointments for L.H.  L.H. was exposed to syphilis at birth and was supposed to have follow-up exams that Mother did not schedule.

---

[2] The dependency proceedings also involved two of L.H.'s siblings. Mother states in her writ petition that she is only challenging the juvenile court's order as to L.H.  Father's petition similarly focuses on L.H. and makes no argument about the other children.

[3] In addition to the petition filed by her counsel, Mother has submitted several documents to this court (purportedly as an in propria persona litigant), including a "petition" and some exhibits.  Since Mother is represented by counsel, we will disregard these unauthorized filings.

At a detention hearing on July 17, 2024, the court ordered the children detained from Mother. L.H. was initially placed with Father.

The Bureau filed an amended petition on September 17, 2024, adding an allegation that Father had substance abuse problems and had tested positive for amphetamine, methamphetamine, and cocaine/benzoylecgonine. On September 18, 2024, the court ordered L.H. detained from Father.

At a contested jurisdiction/disposition hearing in October 2024, the court sustained the amended petition and directed that Mother and Father be provided reunification services. The Bureau's report for the hearing stated Mother had neglected the children and failed to supervise and protect them; Father had failed to protect the children from Mother's conduct; both parents had engaged in substance abuse; and the Bureau was concerned the parents would "continue to neglect the needs of the children due to their inability to provide a safe home environment, provide proper care and supervision, and medical treatment."

The parents' case plan required them to complete parenting classes; attend the children's school, therapy and medical appointments, if asked; stay free from illegal drugs; attend Alcoholics Anonymous (AA) 12-step meetings; drug test negative for at least six months; and complete outpatient substance abuse treatment programs. Visitation was to be provided for both parents.

## B. *The Six-Month Review*

The six-month review hearing commenced on April 2, 2025, continued on May 7, 2025, and was completed on June 25, 2025. L.H. had been placed with his paternal grandparents and was stable in their care.

The Bureau recommended continuing services until the 12-month hearing. According to reports by the Bureau, the family visits were chaotic, with the parents appearing unprepared to handle the children. Both

parents had positive drug tests and missed tests, although some of these were reclassified as excused. The Bureau received allegations that Mother used her brother's urine for tests.

In March 2025, it was reported the parents were participating in some services, including therapy, drug treatment, and parenting classes. In May 2025, Mother stated she had completed a drug treatment program and was in an aftercare recovery program. She was taking medication for anxiety. Father participated in outpatient drug treatment but turned down the option to reside in an inpatient sober living program.

At the conclusion of the six-month hearing, the court followed the Bureau's recommendation, extended reunification services, and scheduled a 12-month review hearing for September 10, 2025. The parents' case plans were revised to require participation in individual counseling. The court also increased visitation from once to twice per week.

## C. *The Bureau's Report for the 12-Month Review*

In its September 2025 report for the 12-month review hearing, the Bureau recommended that the court terminate reunification services for the parents and set a section 366.26 selection and implementation hearing. The parents had participated in therapy. Mother had seen four different therapists for short periods of time. The parents reported maintaining a period of sobriety. Both parents submitted AA/NA sign-in sheets that included future dates. Both parents had some missed and positive drug tests between August 2024 and August 2025.

During visits with the children, Mother was described as bringing unhealthy food and relying on Father to supervise the children. Mother only minimally engaged with the children and rarely showed affection toward them. Father provided supervision and engaged with the children. He provided snacks, sugary foods, soda and juice at the visits. Some visits

were chaotic, with the children fighting and inadequately supervised. At one visit, Mother commented that one of her older children (not one of the three involved in the current dependency proceeding) is her favorite.

In recommending termination of services, the Bureau stated Father had relapsed with a positive drug test in May 2025; the parents had not engaged in sufficient therapeutic services to address the factors that led to the children's removal; Mother was not stabilized on psychotropic medication to address her anxiety; and Mother had not shown the capacity to meet the children's needs. The parents appeared to lack an understanding of the level of care and supervision necessary to meet the children's needs. The parents had made minimal progress despite receiving 12 months of services.

## D. *The 12-Month Review Hearing*

The contested 12-month review hearing was held over several court days, beginning on October 15, 2025, and concluding on January 14, 2026. The court heard testimony from the social worker, the social casework assistant (who supervised visits), Mother, and Father. The court also received documentary evidence.

The social worker stated Mother was not in compliance with the therapy requirement in her case plan because Mother kept starting with new providers and was not making progress. One of the therapists provided a letter to the Bureau stating Mother was not on time, canceled appointments, and was not in a private area where they could conduct virtual or phone sessions. The therapist stated Mother had not made progress toward taking accountability for how her children ended up unsupervised outside. On one occasion, the therapist challenged Mother about her relationship, and Father responded directly to the therapist, which alarmed the therapist because Father should not have been present.

The social worker opined that Mother did not gain any insight from the therapists because each time she changed therapists she had to restart the rapport-building stage.

The social worker testified that a rock found in L.H.'s younger sibling's diaper after a park visit showed negligence by the parents in supervising the children. The social worker observed a visit at a bowling alley (the location chosen by the parents), which was not a child-centered visit.

The social worker stated that, although the parents had been drug testing negatively for the past few months, the Bureau recommended termination of reunification services because the risk to the children remained high, and the parents had not demonstrated they could maintain sobriety. The social worker also did not believe Father had strong boundaries with Mother such that he could keep the children safe and not allow Mother to intervene in their care.

The visitation supervisor testified the visits were "[a] little loud, a little chaotic, fun." The visits had recently transitioned to being loosely supervised. The boys were lively and liked to run, so "you have to be on top of them . . . ." The supervisor felt the parents did a good job of making sure the children's needs were met, such as by bringing snacks and toys. Mother usually focused on her daughter (the youngest child), while Father would run and play with L.H. and his older brother.

There were some visits at the bowling alley and others at parks. In the beginning, the supervisor frequently had to step in to assist. At a recent visit at a park in October 2025, L.H.'s brother walked off without the parents noticing, and Mother initially would not rush after him. On another occasion at the same park, Father had to run after L.H.'s brother and grab

him before he got to the street, which the supervisor described as "a close call." In general, Mother was resistant to suggestions from the visitation supervisor.

Mother testified she had completed parenting classes and was drug testing negative. When describing the steps of the AA/NA recovery program in which she was participating, Mother stated she had gone through all 12 steps and had started going through them again. She expressed confusion about which step was which. Mother had changed therapists multiple times. She had stopped taking the medication that had been prescribed to help with her anxiety. When shown photos of L.H. and his sibling on the day they were detained by police in July 2024 (i.e., when they were wandering outside Mother's home unattended), Mother asserted the police or neighbors had put dirt on the children to make it look like they were neglected.

Father testified he sometimes stays with Mother and sometimes with a friend. Father denied that a positive drug test in April 2025 was accurate. Father had certificates from parenting and other classes he had completed. Father acknowledged he used drugs after L.H. was removed from his care, but he denied regular usage after that time. He was currently testing negative. He was participating in therapy. Father testified that he believes the reason his children were detained from his care is that he failed a drug test.

## E. *The Court's Ruling*

At the conclusion of the hearing on January 14, 2026, and after hearing argument, the court found the return of L.H. to parental custody would create a substantial risk of detriment to his safety, protection, or well-being; the Bureau had offered reasonable services; and there was not a substantial probability L.H. would be returned by the end of the 18-month

period (which was just two months away, in March 2026).  The court terminated reunification services to the parents and set a section 366.26 hearing for May 13, 2026.

In explaining its ruling as to L.H. and his siblings, the court noted the history of the dependency proceeding revealed a longstanding dysfunctional relationship between Mother and Father.  Mother had a long history with child welfare issues, and she had four older children who were not in her care.  Mother had performed well in a residential drug treatment program years earlier, but in contrast displayed a "complete and utter lack of insight" when testifying in the current proceeding.  Mother did not have any understanding or knowledge of the 12 recovery steps.  In the present case, when Mother was assessed to be appropriate for a higher level of substance abuse intervention, she opted for the lowest level.  Even at that level, Mother was inconsistent in her engagement.

The court noted that Mother's therapist had reported that Mother was inconsistent with scheduling.  Mother told the therapist that she could not meet on video because she could not get the app on her phone, so they did phone calls, but Mother would put the therapist on speaker with Father present, which the court noted "completely invades and destroys the patient-therapist relationship and the confidential nature of those discussions."  The therapist noted Mother had not made progress toward taking accountability for how her children ended up unsupervised outside.

The court noted this report by the therapist was in accord with Mother's testimony at the hearing, in which "after all this time and all this engagement in services, including a parenting class, to say that it was the, quote-unquote, cops and neighbors who made the children look dirty and messy.  The translation of that is, I did absolutely nothing wrong, and this

8

was a complete setup. [¶] It's shocking that at this contested review that Mother pretty much ends her testimony on that. That shows, in my view, no insight and really no accountability and very little, if any, progress."

The court found Mother was inconsistent with mental health treatment, transitioning between four different providers over the course of the dependency proceeding. Mother was also "inconsistent and sporadic" in her engagement with drug treatment providers and had "not attended a one-on-one [session] for months." Mother's lack of insight was also reflected in her decision to stop taking her medication, a decision the court found "deeply concerning." Mother did not follow up on annual checkups for L.H., although he had been diagnosed with what "could have been [a] life-altering disease, infection when he was born."

The parents had been provided with extensive visitation, but the quality of the observed portions of the visits was problematic, with "chaos and disorganization" as "the themes that run with that." During visits, Mother frequently focused solely on her daughter (the youngest child), and even this child was seated in a stroller most of the time. Mother was "combative and uncooperative and defensive" throughout the proceedings.

As to Father, the court stated, "I don't know that he is really a noncustodial nonoffending parent given his involvement with Mother in these matters." The court noted Father "had a front-row view to all of this and left these kids in Mom's care and did nothing to intervene. And, in fact, was with Mom the night before and apparently the early morning of the time these children were found wandering outside."

Neither parent had acknowledged or accounted for their many missed drug tests (although some turned out to be excused), and both had positive tests. More recently, the parents had been showing up for drug tests and

9

testing negative.  The court found, however, that the parents had not shown insight.  The court added that, at least as to Father, his approach seemed to be "check off the boxes.  And I checked those boxes, and now I want my children back."

The court found that, based on the record and the concerns it had outlined, returning the children to parental custody would not be appropriate.  The court found by a preponderance of the evidence that a return to parental custody would create a substantial risk of detriment to L.H.'s safety, protection or physical or emotional well-being.  The court found by clear and convincing evidence that reasonable services were offered to the parents.  Finally, the court found there was not a substantial probability L.H. would be returned to parental custody by the time of the 18-month review hearing, which would need to be held in just two months, in March 2026.  The court therefore terminated reunification services and set a section 366.26 hearing.

## II. DISCUSSION

### A. *Legal Standards*

At the 12-month review hearing, the juvenile court "shall order the return of the child to the physical custody of their parent or legal guardian unless the court finds, by a preponderance of the evidence, that the return of the child to their parent or legal guardian would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." (§ 366.21, subd. (f)(1).)  The Bureau has the burden to show detriment.  (*Ibid.*)

If the child cannot be returned to parental custody, the court generally has three options: (1) continue the case for up to six months for an 18-month permanency review hearing under section 366.22 (see § 366.21, subd. (g)(1)); (2) schedule a selection and implementation hearing to be held within 120

10

days under section 366.26 (§ 366.21, subd. (g)(4)); or (3) order the child to remain in foster care (§ 366.21, subd. (g)(5)).

The case will be continued to an 18-month hearing only if the court "finds that there is a substantial probability that the child will be returned to the physical custody of their parent or legal guardian and safely maintained in the home within the extended period of time or that reasonable services have not been provided to the parent or legal guardian . . . ." (§ 366.21, subd. (g)(1).) To find a substantial probability of return, the court must "find all of the following: [¶] (A) That the parent or legal guardian has consistently and regularly contacted and visited with the child. [¶] (B) That the parent or legal guardian has made significant progress in resolving problems that led to the child's removal from the home. [¶] (C) The parent or legal guardian has demonstrated the capacity and ability both to complete the objectives of their treatment plan and to provide for the child's safety, protection, physical and emotional well-being, and special needs." (*Ibid.*)

We review the juvenile court's findings on these points for substantial evidence. (*J.H. v. Superior Court* (2018) 20 Cal.App.5th 530, 535; *In re B.S.* (2012) 209 Cal.App.4th 246, 252.)

## B. *Analysis*

As noted, the juvenile court, applying the legal framework outlined above, found that (1) returning L.H. to parental custody would create a substantial risk of detriment to L.H.'s safety, protection, or well-being (§ 366.21, subd. (f)(1)), and (2) there was not a substantial probability that L.H. would be returned to parental custody by the time of an 18-month hearing (§ 366.21, subd. (g)(1)), a hearing that would be held in March 2026, just two months after the completion of the 12-month hearing in

11

January 2026.[4]  We conclude, contrary to Mother's and Father's contentions, that these findings are supported by substantial evidence.

Mother contends there was a substantial probability L.H. would be returned to her care by the 18-month date.  Mother argues she made significant progress in resolving the problems that led to L.H.'s removal from her care.  Mother notes she participated in parenting classes, alcohol and drug counseling, and therapy.  She was prescribed medication for her anxiety.  Some providers gave positive feedback on Mother's engagement.  Mother argues she "substantially complied" with services and, while acknowledging her progress has been "rocky," she states she should not be expected to achieve perfection.  Finally, she states she is willing to participate in any services the Bureau recommends.

These arguments do not persuade us the court erred.  Based on the record before it, the court reasonably could conclude (as it did in its thoroughly explained oral ruling) that Mother had not made significant progress towards resolving the problems that led to L.H.'s removal and had not gained insight into those problems.  Mother continued to blame the police and neighbors for the initial incident.  She lacked an understanding of the substance abuse recovery steps.  She had started and stopped with multiple therapists, and there was evidence that, as a result, she had not made meaningful progress in therapy.  Mother stopped taking the medication that was intended to address her anxiety.  Her drug testing record, while it had improved recently, included many missed tests and some positive tests.  The court reasonably could conclude Mother had not

---

[4] The court also found by clear and convincing evidence that reasonable services had been provided to Mother and Father.  (§ 366.21, subd. (g)(4).)  Mother and Father do not challenge this finding in their writ petitions.

made significant progress and there was not a substantial likelihood that the safe return of L.H. to her care would occur in the next two months.[5]

For his part, Father presents a conclusory argument that the court erred—both in finding that an immediate return to parental custody would create a substantial risk of detriment, and in finding there was not a substantial probability of return by the 18-month date—because Father had completed all his services, had a positive relationship with his children, and maintained sobriety. But the court reasonably could take a different view of the record. Father showed a lack of insight about his role in failing to protect the children. In an opinion that the court reasonably could credit, the Bureau expressed concern Father did not maintain adequate boundaries with Mother to properly care for and protect the children. Father had numerous missed drug tests and some positive tests, although he was currently testing negative. It appeared to the court that Father believed he just needed to check the necessary boxes to regain custody. Neither parent has shown the court erred in terminating services and setting a section 366.26 hearing.

---

[5] The cases cited by Mother are distinguishable and do not persuade us the court erred in declining to extend services beyond the 12-month hearing. (See *F.K. v. Superior Court* (2024) 100 Cal.App.5th 928, 931, 935–936 [juvenile court erred in failing to exercise discretion under the different standards applicable at a six-month review hearing, which allow a court to continue services even if no substantial probability of return has been shown]; *Jennifer A. v. Superior Court* (2004) 117 Cal.App.4th 1322, 1344–1345 [parent's missed drug tests did not support termination of reunification services where drug use was not a basis for initial detention and where parent was generally in compliance with reunification plan].)

### III. DISPOSITION

The petitions for extraordinary writ relief and the requests for a stay of the section 366.26 hearing are denied. Our decision is final as to this court immediately. (Cal. Rules of Court, rule 8.490(b)(2)(A).)

STREETER, Acting P. J.

WE CONCUR:

GOLDMAN, J.
SWEET, J.*

---

* Judge of the Marin Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.